CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 13 2012

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| PATRICIA A. DAY, | ) | Civil Action No. 7:12cv00114 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| UNITED HEALTH GROUP, INC. | ) | |
| SHORT TERM DISABILITY PLAN, | ) | |
| | ) | **By: Samuel G. Wilson** |
| Defendant. | ) | **United States District Judge** |

Plaintiff Patricia A. Day brings this action pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), to recover benefits under her short-term disability plan. Day and the defendant, UnitedHealth Group Short-Term Disability Plan[1] ("the Plan"), have filed cross motions for summary judgment. The administrative record in this case shows that UnitedHealth Group Incorporated ("UnitedHealth") and its designated claims administrator have full discretion to interpret the Plan's terms and make benefits determinations, and that UnitedHealth's claims administrator carefully reviewed the materials before it and came to the reasonable conclusion that Day was not disabled within the meaning of her benefits plan because she had not submitted medical evidence that actually demonstrated her inability to perform her job. Accordingly, the court grants the Plan's motion for summary judgment and denies Day's motion for summary judgment.

---

[1] In her complaint, Day incorrectly names the defendant as "United Health Group, Inc. Short Term Disability Plan."

# I.

In 2006, Day started working as a customer-service representative for a UnitedHealth subsidiary, United HealthCare Services, Incorporated ("United HealthCare"). Among other sedentary duties, Day's job required her to field approximately eighty-five calls per day, schedule patient appointments, update patient information, respond to customer complaints, and perform heavy data entry. As a United HealthCare employee, Day had access to short-term disability benefits should she need them. According to the benefits handbook (which contains the terms of the Plan), UnitedHealth designated Sedgwick Claims Management Services ("Sedgwick") as the third-party claims administrator. The benefits handbook provides that employees must satisfy four criteria to be "considered Disabled":

- You have been seen face-to-face by a Physician about your Disability within 10 business days of the first day of absence related to the disability leave of absence;

- Your Physician has provided Medical Evidence that supports your inability to perform the Material Duties[2] of your Own Occupation;

- You are under the Regular and Appropriate Care of a Physician; and

- Your Medical Condition is not work-related and is a Medically Determinable Impairment.

(Admin. R. 25, ECF No. 11.)

The benefits handbook defines "Medical Evidence" as "[c]lear documentation, provided by the Physician supporting your Disability, of functional impairments and functional limitations due to a Medically Determinable Impairment that would prevent you from performing the Material Duties of your Own Occupation . . . safely and/or adequately. (Admin. R. 52, ECF No. 11.) A "Medically Determinable Impairment" is an "impairment that results from anatomical,

---

[2] The Plan defines "Material Duties" as "[t]he essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted." (Admin. R. 51, ECF No. 11.)

2

physiological or psychological abnormality which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by Medical Evidence consisting of signs, symptoms, and laboratory findings, and not only by the individual's statement of symptoms." (Admin. R. 52, ECF No. 11.) And, according to the handbook, Sedgwick "has the exclusive right and discretion, with respect to claims and appeals, to interpret the plan's terms, to administer the plan's benefits, to determine the applicable facts and to apply the plan's terms to the facts." (Admin. R. 11, ECF No. 11.)

In March of 2010, Day embarked on a protracted series of doctor visits to diagnose her abdominal pain (which she initially attributed to a recurrence of diverticulitis) by calling her physician, Dr. Firdaus Dastoor. Over the phone, Dr. Dastoor's office told Day to stay home from work until she felt better, prescribed antibiotics and a "low residue" diet, and set an office appointment for April 7th. On March 24th, Day stayed home from work and went to see Dr. William Fintel at the Blue Ridge Cancer Center for her ongoing iron deficiency. Dr. Fintel noted that Day was morbidly obese, had diverticulitis and fibromyalgia, and used supplemental oxygen for shortness of breath. (Admin. R. 28, ECF No. 11-3.) Dr. Fintel recommended that Day proceed with iron infusions to treat her deficiency. Day returned to work on the 25th, but stayed home again on the 26th.[3] Before the end of March, Day made her claim for short-term disability benefits under the Plan.

On April 7, 2010, Day visited Dr. Dastoor for her scheduled appointment. Dr. Dastoor diagnosed Day with partially resolved diverticulitis, abdominal pain of an unknown cause, iron deficiency anemia, and obesity. Two days later, Day underwent a CT scan of her abdomen, which revealed no evidence of diverticulitis. On April 13th, Day went back to Dr. Dastoor's

---

[3] Because Day returned to work at United on March 25, 2010 (the day following her first disability-related absence) Day's first absence from work for the purpose of her disability claim was March 26, 2010.

3

office, still complaining of lower abdominal pain. After reviewing the results of Day's CT scan, Dr. Dastoor speculated that the pain in Day's abdomen could be "referred" from her spine, and he sent Day for a spinal MRI. Two physicians evaluated Day's MRI. According to Dr. David Keyes, the MRI showed some mild abnormalities, including some slightly bulging discs and hypertrophied joints. Dr. Richard G. Sherry interpreted Day's MRI as showing mild degenerative disc disease and bone spurs in the thoracic region.

Day followed up with Dr. Fintel on April 23, 2010, regarding her iron deficiency. Dr. Fintel noted that Day was feeling moderately better following her first iron infusion but that she would likely need more infusions. Four days later, Day visited Dr. Dastoor with renewed complaints of abdominal pain. Dr. Dastoor noted that Day's lab work and abdominal CT scan appeared normal and that she had mild diverticulitis with no inflammation. He also noted that her MRI showed "some discogenic disease" but that he was "not fully convinced that this [was causing] her discomfort." (Admin. R. 69, ECF No. 11-2.) Dr. Dastoor referred Day to a neurosurgeon for a complete workup.[4] One day later, Day took her MRI to Dr. Philip Fisher. Dr. Fisher found that Day had large bone spurs in the thoracic spine, degenerative disc disease throughout the lumbar spine, and an increasing amount of lumbosacral pain. Dr. Fisher treated Day with a corticosteroid and local anesthetic injection.

On May 7, 2010, Day saw Dr. Bruce Long for abdominal pain that Day attributed to a possible abdominal hernia. After the examination, Dr. Long noted "No diagnosis found," but prescribed weight reduction, an anti-inflammatory drug, and a "bowel program." (Admin. R. 80, ECF No. 11-2.) Day then visited her family practitioner, Dr. Anderson, for her abdominal pain. Dr. Anderson diagnosed Day with right hip pain and hyperthyroidism, and prescribed Celebrex,

---

[4] The neurosurgeon eventually informed Day that he would not consider any type of surgery to alleviate her discomfort. (See Admin. R. 69, ECF No. 11-3.)

4

Phenergan, and Flexeril. Also on May 7th, Day underwent a hip x-ray at the Lewis-Gale Medical Center. The x-ray report indicated that Day had "minimal osteoarthritis" and no fractures, dislocations, or disease-related bone destruction. Day followed up with Dr. Anderson on May 19th regarding her abdominal pain, and he noted that Day had fibromyalgia and that she was "quite frustrated" about her pain. (Admin. R. 24, ECF No. 11-3.) Dr. Anderson prescribed a low dose of Elavil, an antidepressant.

On May 21, 2010, Day followed up with Dr. Fintel regarding her iron deficiency. Dr. Fintel noted that Day's anemia persisted but that she had "a wonderful response" to her first two infusions. (Admin. R. 26, ECF No. 11-3.) Approximately two months later, Day had ultrasounds on her thyroid and uterus. The ultrasound reports found that Day's uterus was "mildly enlarged" with signs of multiple fibroids (Admin. R. 33, ECF No. 11-3) and that her thyroid was enlarged, consistent with goiter (Admin. R. 43, ECF No. 11-3). Finally, on July 28, 2010, Day saw Dr. Fisher for another appointment, complaining of lumbosacral and thoracic pain.[5] Dr. Fisher noted that day described her pain as "constant" and "burning," and he prescribed weight loss, continued medication, three caudal epidurals, and a follow-up visit in August. (Admin. R. 44, ECF No. 11-3.)

As Day was visiting doctors in search of a diagnosis, she was also pursuing her short-term disability claim. On April 13, 2010, Sedgwick issued its first denial of Day's claim, stating that it had not received the required medical documentation from Dr. Dastoor. On the same day, however, Dr. Dastoor sent the required documentation (called an "Attending Physician Statement"), noting that Day had acute diverticulitis and lumbar disc prolapse. He explained that

---

[5] According to Dr. Fisher's appointment notes, Day also saw Dr. Fisher on June 11, 2010. (See Admin. R. 44, ECF No. 11-3.) At some point, Dr. Fisher became Day's primary pain-management physician, and he wrote an addendum to Day's June 11th appointment notes in which he stated that Day had a "poor prognosis for returning to work." (See Admin. R. 69, ECF No. 11-3.) Sedgwick did not receive that addendum until December 22, 2010, well after Sedgwick's final decision. (See Admin. R. 76, ECF No. 11-3.)

5

Day had complained of abdominal pain; that his objective findings consisted of abdominal tenderness and a high white blood cell count; and that Day was unable to sit, walk, bend, or sleep due to her pain. Dr. Dastoor concluded that Day was totally disabled from work from March 25, 2010, through May 10, 2010.

By letter dated May 4, 2010, Sedgwick issued its second denial of Day's claim. In its denial letter, Sedgwick stated that it had reviewed Dr. Dastoor's Attending Physician Statement, FMLA paperwork from Dr. Dastoor, and two sets of MRI results. Sedgwick concluded that the "medical information submitted [did] not demonstrate that [Day was] unable to perform the material duties of [her] own occupation and/or that [she was] under the regular and appropriate care of a physician as required." (Admin. R. 48, ECF No. 11-2.) On May 24th, Day administratively appealed Sedgwick's decision.

On August 2nd, Sedgwick enlisted an independent reviewing physician, Dr. Robert D. Petrie, to evaluate Day's medical evidence. Dr. Petrie considered a raft of documentation[6] and conducted a substantive teleconference with Dr. Mike Gills[7] (two other teleconferences offered little help). On August 12th, Dr. Petrie completed his five-page report. In it, he explained that

> The patient is morbidly obese with several comorbidities including hypothyroidism and vitamin D deficiency along with iron deficiency. These are currently being treated with recent onset of parenteral iron infusions. The more

---

[6] The benefits handbook provides that, on appeal, the "Claims Administrator will take into account all comments, documents, records and other information submitted to support the appeal without regard to whether the information was submitted in connection with the claim for benefits." (Admin. R. 14, ECF No. 11.) According to the report, Dr. Petrie reviewed progress notes from Blue Ridge Cancer Care dated March 24, 2010, through May 21, 2010; progress notes from an unknown provider dated March 31, 2010, through July 14, 2010; progress notes from the Center for Gastroenterology dated April 7, 2010, through April 27, 2010; progress notes from Dr. Dastoor dated March 10, 2010; progress notes from Dr. Fisher dated April 28, 2010, through July 28, 2010; progress notes from Dr. Long dated May 7, 2010; an x-ray from Lewis-Gale Medical Center dated May 7, 2010; a CT from Lewis-Gale Medical Center dated April 9, 2010; MRIs from Carilion Health System dated March 2, 2010, and April 19, 2010; labs from an unknown provider dated March 24, 2010, through July 14, 2010; a lab from Lee Hi Medical Center from April 7, 2010; a lab from Lewis-Gale Medical Center Laboratory from July 1, 2010; tests from Lewis-Gale Imaging at Brambleton from July 20, 2010; Day's job description; and miscellaneous medical records dated May 4, 2010, through July 14, 2010. (Admin. R. 48, ECF No. 11-3.)

[7] Day claims that Dr. Gills is not a doctor, but she has offered nothing to support that assertion.

6

recent records indicate that she is scheduled to undergo a hysterectomy. Per the records, this is expected to eliminate the underlying cause of the chronic iron deficiency. Problems, which were also identified, include morbid obesity and obstructive sleep apnea. There are no records of any respiratory consultation to indicate that the obstructive sleep apnea would preclude sedentary work activities. A cardiac MRI with functional assessment notes that the patient has adequate left ventricular ejection fraction and there is no evidence of any cognitive impairment, which would preclude sedentary work activities. She does have generalized and nonspecific musculoskeletal complaints, but these also should not preclude sedentary activities. Dr. Gills confirmed during the teleconference that a sit/stand workstation would be an appropriate level of work.

(Admin. R. 51, ECF No. 11-3.) Dr. Petrie concluded that, "from an occupational medicine perspective, documentation does not support the employee to be disabled from her regular unrestricted sedentary job." (Admin. R. 51, ECF No. 11-3.) Sedgwick responded to Dr. Petrie's report by asking him two specific questions intended to clarify whether Day had any restrictions on returning to work. Dr. Petrie answered, "No specific restrictions or accommodations would be applicable for this employee. The employee is not disabled from her regular sedentary job." (Admin. R. 56, ECF No. 11-3.)

Shortly after Dr. Petrie concluded his report, Sedgwick informed Day by letter that it was upholding the denial of Day's claim for disability benefits. The letter explained its reasoning at length and concluded that, "Based on this information, we have determined that the medical information submitted does not demonstrate that you are unable to perform the material duties of your own occupation." This lawsuit is the result.

## II.

The Plan's denial of Day's claim hinged on the requirement that Day offer actual medical evidence—not statements of symptoms—of a condition that rendered Day unable to perform her sedentary occupation. Though Day has compiled an extensive medical record, Sedgwick could conclude that the record is short on such evidence. Given that conclusion, the doctors' apparent

difficulty in connecting the existing evidence to Day's complaints, and the Plan's discretion in making its decision, the court finds that the Plan's decision was reasonable. Accordingly, the court will grant the Plan's motion for summary judgment and deny Day's.

When an "ERISA benefit plan vests with the plan administrator the discretionary authority to make eligibility determinations for beneficiaries, a reviewing court evaluates the plan administrator's decision for abuse of discretion." Williams v. Metro. Life Ins. Co., 609 F.3d 622, 629–30 (4th Cir. 2010). Under the abuse of discretion standard, a reviewing court should not disturb a plan administrator's decision if the decision is reasonable, even if the court would have come to a contrary conclusion independently. Id. at 630. The reviewing court is not to substitute its own judgment in place of the plan administrator's judgment. Id. In making that determination, courts look to the eight factors enumerated in Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335 (4th Cir. 2000):

> (1) the language of the plan;
>
> (2) the purposes and goals of the plan;
>
> (3) the adequacy of the materials considered to make the decisions and the degree to which they support it;
>
> (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan;
>
> (5) whether the decisionmaking process was reasoned and principled;
>
> (6) whether the decision was consistent with the procedural and substantive requirements of ERISA;
>
> (7) any external standard relevant to the exercise of discretion; and
>
> (8) the fiduciary's motives and any conflict of interest it may have.

Williams, 609 F.3d at 630 (citing Booth, 201 F.3d at 342–43).

In this case, Sedgwick relied primarily on the second part of the Plan's disability definition, namely that "[Day's] Physician [provide] Medical Evidence that supports [her]

8

inability to perform the Material Duties of [her] Own Occupation." (Admin. R. 25, ECF No. 11; Admin. R. 62, ECF No. 11-3.) In deciding whether the existing medical evidence supported Day's inability to perform her occupation, Sedgwick employed an independent reviewing physician, Dr. Petrie, to examine the evidence that Day had submitted. The evidence included progress notes, x-rays, CT scans, MRIs, and various other tests and lab reports. Dr. Petrie's five-page report shows that he evaluated that evidence and noted several medical conditions and ongoing medical treatments, but found nothing objective indicating that Day's various conditions would actually prevent her from performing her "own occupation." Dr. Petrie therefore concluded that "from an occupational medicine perspective, documentation does not support the employee to be disabled from her regular unrestricted sedentary job." (Admin. R. 51, ECF No. 11-3.) On that reasoning, Sedgwick denied Day's claim. Though the court has no doubt that Day's complaints are genuine, the court cannot say, based on the administrative record, that Sedgwick unreasonably decided that Day's medical evidence failed to demonstrate that she could not perform her sedentary occupation.

Day contends that important Booth factors fall in her favor. First, she argues that that Dr. Dastoor (her physician) found that she was disabled and that "the language of the plan" (Booth factor two) "contemplates that for purposes of short term disability benefits, the Plan will rely on the report of '*Your Physician*' supportive of inability to perform your own occupation." (Mem. Supp. Mot. Summ. J. 9, ECF No. 12) (emphasis added). The Plan's definition of disability does not, however, as Day suggests, vest her treating physician with the authority to determine her disability status. Rather, it requires her treating physician to provide *medical evidence* that actually supports her inability to perform her occupation. The authority to determine whether the medical evidence *in fact* supports such a finding, and to make the ultimate disability

9

determination, is Sedgwick's. (See Admin. R. 25, ECF No. 11) ("Sedgwick CMS determines whether or not you are Disabled as defined by the Plan."); (id. at 11) ("[Sedgwick] has the exclusive right and discretion, with respect to claims and appeals, to interpret the plan's terms, to administer the plan's benefits, to determine the applicable facts and to apply the plan's terms to the facts."). And "[n]othing in [ERISA] suggests that plan administrators must accord special deference to the opinions of treating physicians." Black and Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003).

Second, Day takes issue with Sedgwick's employment of Dr. Petrie, his evaluations of the medical evidence, and his phone calls to other medical professionals. Day argues this point under Booth factor two ("the language of the plan"), because the Plan refers to "Your Physician" and not "an independent physician." However, the court discerns nothing in the Plan preventing Sedgwick from employing an independent physician to evaluate the existing medical evidence in aid of Sedgwick's decision. (Cf. Admin. R. 47, ECF No. 11) ("[Sedgwick] has the right to request that you and/or your Physician clarify or verify the medical information that you or your Physician submit. A request for clarification or verification may include independent medical examinations, functional capacity evaluations, second medical opinions, peer-to-peer reviews, job site evaluations, surveillance and other similar means.").

Third, and finally, Day points to Booth factor six (whether the decision was consistent with the procedural and substantive requirement of ERISA) and to several alleged defects in the Plan's three denial letters. She claims that these defects render the letters noncompliant with ERISA's mandate that denial letters include the specific reason for the denial and specific reference to the plan provision on which the denial is based. See 29 C.F.R. § 2560.503-1(g); see also 29 U.S.C. § 1133. Having examined the letters closely, the court finds that they are

substantially compliant with ERISA in that they contain "a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." Brogan v. Holland, 105 F.3d 158, 165 (4th Cir. 1997); see also Larson v. Old Dominion Freight Line, Inc., 277 F. App'x 318, 321 (4th Cir. 2008).

If anything, the record in this case shows that after multiple doctor visits and myriad medical tests, Day's own doctors struggled to attribute her pain to any particular medical finding. (See, e.g., Admin. R. 69, ECF No. 11-2.) (Dr. Dastoor, noting that he was "not fully convinced that [Day's abnormal spinal MRI was causing] her discomfort."). Even if the court would have independently come to a contrary conclusion regarding Day's disability claim, Sedgwick's decision in this case was reasonable, and it is not within the court's province to disturb it.

## III.

The court concludes that Sedgwick's decision-making process was reasoned and principled, and that the materials on which it relied adequately supported its decision. For that reason, and for the other reasons stated, this court is unable to conclude that Sedgwick's denial of Day's short-term disability claim was unreasonable. Accordingly, the court grants the Plan's motion for summary judgment and denies Day's motion for summary judgment.

**ENTER**: December 13, 2012.

UNITED STATES DISTRICT JUDGE